**DISTRICT OF OREGON**
**F I L E D**
**June 15, 2026**
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

_____
PETER C. McKITTRICK
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>CHRISTOPHER T. FISHER AND LINDA D.<br>FISHER,<br><br>Debtors. | Case No. 25-60133-pcm7 |
| MACON VALLEY CAPITAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER T. FISHER,<br><br>Defendant. | Adv. Proc. No. 25-6031-pcm<br><br>MEMORANDUM DECISION[1] |

Plaintiff-Creditor Macon Valley Capital ("Plaintiff" or "Macon Valley") seeks a determination that a

state court default judgment against Defendant-Debtor Christopher Fisher ("Debtor") is a nondischargeable

---

[1]    This disposition is specific to this case and is not intended for publication or to have a controlling
effect on other cases.  It may, however, be cited for whatever persuasive value it may have.

Page 1 of 15 – MEMORANDUM DECISION

debt under § 523.[2]  The court has considered the testimony of the witnesses, the documents entered as exhibits, and the legal arguments of the parties.  What follows are the court's findings of fact and conclusions of law.

## JURISDICTION

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  Venue is proper in this court.  28 U.S.C. § 1409(a).

## PROCEDURAL BACKGROUND AND FACTS

Debtor and his spouse filed a chapter 13 bankruptcy petition in January of 2025 and later converted to chapter 7.[3]  In July of 2025, Plaintiff commenced this adversary proceeding.[4]  Plaintiff's amended complaint objects to dischargeability of the state-court default judgment as a debt for embezzlement under § 523(a)(4).[5]  The court conducted a trial on May 14 and 15, 2026.

Debtor is a licensed real estate agent and a principal of Green Northwest Real Estate, LLC ("Green NW").  Ian Griffin ("Griffin"), Debtor's principal broker, was Debtor's partner in Green NW.

Marquita Causey is the sole member and principal of Macon Valley.  Causey and Debtor met on Facebook and began discussing the potential purchase and renovation of real property located on Liberty

---

[2]  Unless otherwise noted, all references to chapters and sections are to the Bankruptcy Code, 11 U.S.C. § 101, et seq.

[3]  Case No. 25-60133-pcm7, ECF Nos. 1, 40.

[4]  Adv. Proc. No. 25-6031-pcm, ECF No. 1.

[5]  ECF No. 39.

Page 2 of 15 – MEMORANDUM DECISION

Drive in Salem, Oregon (the "Liberty Property"). In March of 2023, Debtor emailed Causey proposed terms for a joint-venture, stating that he had attached "3 properties as comps," although the record does not include the attachments to the email.[6] In his email, Debtor provided a profit estimate based on the Liberty Property selling for 1.5 million dollars.[7]

In April of 2023, Green NW and Macon Valley executed a joint venture agreement (the "Agreement"), signed by Causey for Macon Valley and by Debtor and Griffin for Green NW.[8] The parties' expectation, as shown through their correspondence, was that the purchase and renovation costs of the Liberty Property would total approximately $650,000.[9] Under the Agreement, the parties agreed to "purchase, rehab, and sell" the Liberty Property, with Green NW providing $550,000 in funding and Macon Valley providing $100,000.[10] The Agreement clarified that Macon Valley was "only in the Joint Venture as a monetary investor," and that Green NW would hire contractors and perform all work and rehabilitation on the Liberty Property.[11]

To memorialize Macon Valley's $100,000 investment, Causey provided a promissory note (the "Note") requiring Green NW to repay $100,000 plus 30% of profits from the Liberty Property upon sale or

---

[6]     ECF No. 67, Ex. 9.

[7]     *Id.*

[8]     *Id.,* Ex. 11.

[9]     *Id.,* Ex. 9.

[10]    *Id.,* Ex. 11.

[11]    *Id.*

no later than December 31, 2023.[12]  The Note stated that the obligation would be secured by a trust deed on property located on Candelaria Street in Salem, Oregon (the "Candelaria Property").[13]  Neither the Note nor the Agreement addressed the trust deed's priority or the Candelaria Property's lien status.  The copy of the Note introduced as an exhibit at trial was not signed and Debtor testified he did not recall signing it.  However, Debtor did not deny that the Note accurately reflected the terms agreed to by the parties.  Neither the Agreement nor the Note required Green NW to place any payments into an escrow or trust account, and there was no evidence that Green NW otherwise agreed to do so, either verbally or in writing.

Green NW maintained a JPMorgan Chase bank account (the "Chase account").[14]  By April 7, 2023, Causey and an associated investor wired a total of $100,000 into the Chase account.[15]  Between April 10 and 14, 2023, Green NW deposited an additional $94,110 into the Chase account from unrelated sources.[16]

To finance the acquisition and renovations of the Liberty Property, Advanced Investment Corp. ("AIC") entered into a Non-Consumer Business Purpose Credit Agreement with Green NW that outlined purchase terms and created a $110,000 construction reserve to be held and administered by AIC.[17]  The Liberty Property purchase closed on April 21, 2023.[18]  Escrow records from WFG National Title reflect that

---

[12]     *Id.,* Ex. 12.

[13]     *Id*.

[14]     ECF No. 69, Ex. Q.

[15]     *Id*.

[16]     *Id*.

[17]     ECF No. 67, Ex. 10.

[18]     ECF No. 69, Ex. E.

AIC's loan proceeds were deposited into escrow along with $10,000 paid by check from Green NW and $79,619.24 paid from the Chase account.[19]

The renovation of the Liberty Property began in May of 2023 and was primarily managed by Griffin. At Griffin's recommendation, Green NW hired Jason and Wesley Desmond as contractors. Debtor focused on other renovation projects while Griffin communicated with the Desmonds about the renovation, though Debtor remained Causey's primary point of contact. Wesley Desmond (through Wes Desmond Construction) agreed, in a handwritten document, to paint portions of the Liberty Property for $25,000.[20] Other than that handwritten agreement, Green NW had no written contract with Jason or Wesley Desmond (or any other contractor) for the renovations. During the time the Liberty Property renovations took place, Jason Desmond was not a licensed contractor.

From AIC's construction reserve account, $24,000 was paid to "Wes Desmond Construction" in May of 2023, and, from June through October of 2023, a total of $67,102 to "Desmond Limited Co."[21] Additionally, de minimis amounts were paid to Lowe's and Salem Bargain Center, and $11,000 was paid to Green NW to make payments on the AIC loan, with $11,000 shortly thereafter deposited back into the reserve account by AIC.[22] Each draw request Green NW made under the AIC agreement for contractor payments was submitted pursuant to the construction budget drafted by Debtor and in accordance with

---

[19]    *Id.*, Exs. E and Q.

[20]    ECF No. 67, Ex. 20.

[21]    ECF No. 69, Ex. C.

[22]    *Id.*

AIC's disbursement procedures.[23]  Debtor testified, without contradiction, that he did not personally receive any funds from the reserve account.

From May through November of 2023, Causey and Debtor exchanged text messages regarding the status of the Liberty Property.[24]  Debtor provided updates upon request between April and September of 2023, but often responded untimely and with vague or elusive answers.  In May of 2023, Debtor told Causey the Liberty Property would have "high end finishes, appliances, and everything" and reach a "goal value" of $1.5 million.[25]  In June of 2023, Debtor told Causey he hoped the property would be finished by July.[26]

In late November of 2023, AIC issued a "Demand for Payoff" to Green NW after Green NW stopped making payments under the credit agreement.[27]  Causey learned Green NW was delinquent when AIC issued that demand.  When Causey attempted to exercise her rights under the Agreement and Note, she discovered that other unrelated investors held beneficiary interests in the Candelaria Property.

The renovations to the Liberty Property were never completed, and Debtor and Causey were unable to find a buyer at a sufficient price to pay off AIC and provide any return to the parties.

---

[23]    ECF No. 67, Ex. 10, p. 9; ECF No. 69, Exs. G and. H.

[24]    ECF No. 67, Ex. 15.

[25]    *Id.,* Ex. 15, p. 33.

[26]    *Id.,* p. 41.

[27]    *Id.,* Ex. 21.

In January of 2024, Debtor filed a breach-of-contract complaint against Wes Desmond Construction with the Construction Contractor's Board.[28]  Although the record does not clearly reflect the disposition of that complaint, Wesley Desmond testified that he met with the contractor's board and that, after one meeting, the complaint was dropped.

Plaintiff later initiated a state court lawsuit against Debtor, Griffin, and Green NW for default on a promissory note, fraud, breach of fiduciary duties, breach of contract, and negligent misrepresentation.[29]  In July of 2024, the state court entered a default judgment against Debtor and Green NW on those claims in the amount of $340,000 (the "state court judgment").[30]

In 2025, the Oregon Real Estate Agency ("OREA") entered a stipulated order disciplining Debtor for (1) advertising a guarantee of future profits, (2) failing to provide a proper Competitive Market Analysis of the Liberty Property, (3) failing to inform Causey that she was not the only entity secured by the Note and trust deed on the Candelaria Property, and (4) failing to report an adverse judgment to OREA within 20 days.[31]  Debtor stipulated to OREA's findings and conclusions of law, and testified at trial that he agreed to the terms of the OREA order because he was distraught over the project's failure.

## ANALYSIS

"Embezzlement" under § 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Transamerica Com. Fin. Corp.*

---

[28]    ECF No. 69, Ex. F.

[29]    ECF No. 67, Ex. 27.

[30]    *Id.*, Ex. 28.

[31]    *Id.*, Ex. 1.

*v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991)(quoting *Moore v. United* States, 160 U.S. 268, 269 (1895)).  In the Ninth Circuit, the elements of embezzlement are: (1) property rightfully in the debtor's possession belonging to another; (2) appropriation of that property for a use other than for which it was entrusted; and (3) circumstances indicating fraud.  *Id.* (quoting *Nat'l Bank of Com. of Pine Bluff v. Hoffman (In re Hoffman)*, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986)).  Plaintiff bears the burden by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

## A.  Property Rightfully in Debtor's Possession

The first element of embezzlement requires that the property be in the rightful possession of a nonowner, and no fiduciary relationship is required for this element.  *Murray v. Woodman (In re Woodman)*, 451 B.R. 31, 41 (Bankr. D. Idaho 2011)(quoting *In re Littleton*, 942 F.2d at 555).  Funds transferred for a designated purpose and held by a contracting party for that purpose may satisfy this element.  *See Hales v. reed (In re Reed)*, 646 B.R. 319, 327 (Bankr. D. Or. 2022)(funds deposited and held in trust by a contractor for purchase of materials were in the rightful possession of a nonowner).  There is no dispute between the parties that Green NW and Debtor were in rightful possession of the $100,000 Causey wired to Green NW.

The second and third elements create more challenging questions.  Was the $100,000 misappropriated by Debtor and was his conduct indicative of fraud?

## B.  Misappropriation

To prevail on a § 523(a)(4) claim based on embezzlement, a plaintiff must show that the debtor misappropriated the entrusted property, i.e., that the debtor used the entrusted property in a way that is inconsistent with the original purpose or terms of its entrustment.  *Id*. at 327; *First Del. Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 577 (9th Cir. BAP 1997); *Sai Supermarkets, Inc. v. Soto (In re Soto)*, 676 B.R. 612, 619 (Bankr. E.D. Cal. 2026).  It is crucial to understand that the Agreement did not require Debtor or

Green NW to segregate or hold Plaintiff's funds in trust.  Plaintiff and Debtor agreed only that the funds would be used in conjunction with the purchase and renovation of the Liberty Property.  Plaintiff did not require that a reserve account be established or that the funds remain segregated from Green NW's other funds.  As is stated above,  $79,619.24 of the funds in the Chase account went directly from that account to the closing escrow at WFG National Title within approximately two weeks of when they were wired to Green NW by Plaintiff.  Those funds clearly were not misappropriated by Green NW or Debtor.

As for the remaining amount of Plaintiff's funds, approximately $20,381, Plaintiff has not shown that Debtor used that money for a purpose other than the Liberty Property project.  It is Plaintiff's burden to prove funds were misappropriated, and "[t]he problem with Plaintiff's argument is that while concededly [Debtor] has not volunteered what the remaining funds were used for, Plaintiff has not presented any evidence of how the remaining funds were spent." *Bankers Healthcare Group, LLC v. Johnson (In re Johnson)*, 638 B.R. 782, 793 (Bankr. C.D. Cal. 2022)(finding that the plaintiff did not meet burden of proof under § 523(a)(2)(A)).  The evidentiary record leaves open many questions about the use of the remaining funds in the Chase account.  Plaintiff's counsel candidly admitted as much during closing argument, stating: "It's like a multiple-choice question: 'Were my client's funds used for the rehab or this project?'—A.  Yes, B.  No, C.  Maybe. D.  We don't know.  The answer is really D.  We have no idea." All transactions from the Chase account were traceable through bank records, yet the record is insufficient to conclude how the Chase account funds were spent, and the consequence of that rests upon the shoulders of Plaintiff, not Debtor.

At trial, Plaintiff's attorney also argued that funds were misappropriated simply because Green NW hired an unlicensed contractor and paid for work that was either not done or was faulty.  There are two problems with that argument.  First, Debtor had no part in hiring the contractors.  Griffin managed the renovation of the Liberty Property.  Second, paying an unlicensed contractor or paying for substandard work

does not constitute misappropriation. *Cabrera v. Larranaga (In re Larranaga)*, 2010 WL 3521732, at *6 (Bankr. D. N.M. Sept. 3, 2010). In *Larranaga*, the bankruptcy court was faced with the exact argument raised by Plaintiff in this case. *Id*. The court rejected that argument, stating: "[p]ayment made for work not performed in a workmanlike manner in breach of contract, or for work performed without a required license, does not transform a breach of contract or fraud claim into a claim for embezzlement." *Id*.

For the reasons stated above, the court finds that Plaintiff has not met its burden of proof as to the second element of embezzlement.

### C. Circumstances Indicating Fraud

Even if the court were to find that Plaintiff proved the funds were misappropriated, and it has not, Plaintiff has not carried its burden to show that the circumstances surrounding the failure of the Liberty Property project indicate fraud.

The Supreme Court has clarified that embezzlement under § 523(a)(4) requires a showing of wrongful intent, described as "moral turpitude or intentional wrong" or "felonious intent." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013). Therefore, "circumstances indicating fraud" can be found where the debtor must have consciously disregarded or was willfully blind to a substantial and unjustifiable risk, demonstrating a gross deviation from the standard that a law-abiding person would observe. *Id*.

As a threshold matter, the court makes the following observations regarding witness credibility. The court found Causey and Debtor to both be credible. In the limited circumstances where their testimony conflicted, Causey's testimony was more persuasive.

In piecing together the testimony, the court concludes that both Causey and Debtor were victims of their own lack of experience in real estate investing and lending, and both appear to be victims of Griffin's gross mismanagement of the Liberty Property project. Causey failed to take many basic steps to protect

herself that a more experienced real estate lender would take, such as obtaining appraisals and title reports on collateral, and outlining reporting requirements in agreements. Debtor placed unwarranted trust in Griffin and did not pay sufficient attention to the project.

No doubt, Debtor "over-sold" the project and his level of experience, and the court does not condone that conduct. However, his conduct did not rise to a conscious disregard for the truth or being willfully blind to a substantial and unjustifiable risk. Debtor got over his skis because he was inexperienced in real estate renovations and relied on his partner. He made matters worse and did what most debtors do when they get in trouble: he delayed communicating, remained unrealistically optimistic, and painted a rosy picture of the renovation progress to Causey. His conduct was not an effort to cover up a continuing fraud. Instead, Debtor failed to acknowledge that the project was a complete mess.

The court will specifically address each of the detailed allegations Plaintiff made at trial and in Plaintiff's trial memorandum:

- "[Debtor] failed to provide a proper Competitive Market Analysis of the subject property value."[32] The Agreement between Debtor and Macon Valley did not require Debtor to provide a Competitive Market Analysis. The record at trial referenced two documents relating to value: The first was the email sent by the Debtor to Causey that references three comparative properties, which did not include the attachment with the comparables; and second, a reference to an appraisal in Exhibit 33, which is also not in the record. Although the OREA stipulated order found that Debtor had violated his obligations as a licensed realtor, the evidence before the court shows Debtor did not submit a "CMA" to Macon Valley at all, and was not required to do so under the parties' agreement.

---

[32]    ECF No. 65, p. 3.

- "[Debtor] fraudulently guaranteed future profits from real estate activity, for which he was disciplined by the OREA."[33]  The Agreement does not make any such guarantee.  Debtor stated that he believed the property could be sold for $1,500,000 after renovation.  This was certainly an aggressive projection, but was not a guarantee.

- "[Debtor] fraudulently failed to disclose that the collateral for Macon Valley's loan, consisting of real property located at 175 Candalaria, was already encumbered."[34]  Testimony was conflicting as to whether there was disclosure of the other liens.  The court finds Causey's testimony that she was not told of the other liens more persuasive than Debtor's testimony that he thought he told her.  Debtor seemed uncertain that he had told her about the other liens.  However, there was no testimony that Debtor represented that the property was free of other liens.  In addition, liens are a matter of public record.  It is not reasonable for a lender to rely on statements of a borrower regarding the status of title in lieu of doing a simple title search.

- "[Debtor] never informed plaintiff regarding where Macon Valley's funds were being held or how they were being used."[35]  Again, the Agreement did not have any requirements regarding the holding or use of the funds, or require that Green NW provide any specific updates or accounting.  However, as a partner to the joint venture, Causey had a reasonable expectation that Green NW would provide information and updates.  The record does show that, when the project's completion was delayed, Causey did ask for information about the project and how the funds were being used.  Debtor's

---

[33]     *Id.*

[34]     *Id.*

[35]     *Id.*

Page 12 of 15 – MEMORANDUM DECISION

responses were often vague and painted a picture that was not realistic.  However, based upon my observation of Debtor's testimony, his reluctance to provide more information and objectively analyze the status of the project was based on a misguided hope that it would come together rather than fraudulent conduct.

- "[Debtor] constantly boasted of money made from other projects, his in-depth experience of over 10 years in commercial real estate, when in fact he was heavily in debt on multiple prior obligations."[36] Debtor testified that he was combining his experience with his partner's, and that he relied on Griffin's real estate experience and expertise.  There was no doubt puffery in Debtor's statements to attract this investment, and if coupled with misappropriation, such statement could be an indication of fraud.  But in this instance, the statements were not made in connection with tortious conduct and, in balance, the court finds they were not indicative of fraud.

- "[Debtor] falsely represented that he had "pocket millionaires" looking at the subject project."[37]  The evidence does not support Plaintiff's contention.  Debtor provided names of wealthy people who had looked at the Liberty Property project.  There was no testimony to the contrary or impeachment of Debtor's testimony on this point.

- "[Debtor] doubled the construction budget without informing Macon Valley."[38]  After considering all the evidence, the court concludes that the fact that the project went over budget shows that Debtor was unrealistic and inexperienced, not that he was intentionally hiding a misuse of funds.

---

[36]     *Id.,* p. 4.

[37]     *Id*.

[38]     *Id*.

Page 13 of 15 – MEMORANDUM DECISION

- "[Debtor] never listed the property for sale, as promised."[39]  The evidence is clear that the Liberty Property was not in a condition to be listed for sale.  Some of the work that was done was apparently removed by the contractor or subcontractor.  Both parties were trying to wholesale the property but received only lowball offers.  The court finds Debtor's testimony credible on this point.

- "[Green NW] became delinquent on its obligations to its primary lender, without informing Macon Valley."[40]  First, there is nothing in the Agreement that required Green NW or Debtor to notify Plaintiff of any delinquency to AIC.  Although such a failure could be an indication of fraud, in this case it was a misguided unwillingness to face the music rather than fraudulent conduct.

- "[Debtor] blocked Macon Valley from taking over the project."[41]  This is another example of poor communication by Debtor and a failure to own up to the project's failure when he should have.

- "[Debtor] proposed Macon Valley join his company in a suit against the contractors on claims which appeared baseless, if not fraudulent."[42]  The court does not find this allegation to indicate fraud. Debtor was clearly at the end of his emotional and financial rope.  He knew he had been duped by his partner and/or the contractors, and was trying to figure out some way to salvage Macon Valley's investment.

---

[39]     *Id.*

[40]     *Id.*

[41]     *Id.*

[42]     *Id.*

**CONCLUSION**

For the foregoing reasons, the court finds that Plaintiff's claim fails and the debt owed to Plaintiff is dischargeable.  Debtor should tender a judgment declaring the debt dischargeable no later than 14 days after entry of this memorandum decision.